**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING**

FILED

SEP 2 8 2020

U.S. DISTRICT COURT-WVND
WHEELING, WV 26003

UNITED STATES OF AMERICA,

          Plaintiff,

v.

          CRIM. ACTION NO.: 5:19CR24
          (BAILEY)

RICKY D. RUNNER,

          Defendant.

## REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT DEFENDANT'S MOTION [21] TO SUPPRESS AND SUPPLEMENTAL MOTION [32] TO SUPPRESS BE DENIED

      Currently pending before the Court is Defendant's Motion to Suppress Evidence and Statements [ECF No. 21], filed August 20, 2020. Also pending is Defendant's Supplemental Motion [ECF No. 32] to Suppress, filed September 18, 2020. Defendant's original Motion was referred to the undersigned by Order of Referral [ECF No. 23], filed August 24, 2020. The Government filed its Response [ECF No. 26] on August 26, 2020. An Evidentiary and Oral Argument Hearing took place on September 11, 2020. At the conclusion of the hearing, the parties requested one week within which to file additional briefing. This request was granted. Supplemental briefing was completed by September 18, 2020. After considering the parties' arguments, the applicable law, and the Court file, and after considering the evidence submitted during the September 11, 2020 hearing, the undersigned is prepared to issue a decision.

# I.
# FACTUAL/PROCEDURAL HISTORY

### A. General

Defendant stands charged with one count of Unlawful Possession of a Firearm.   A Forfeiture Allegation is contained within the Indictment, which was returned against Defendant on June 4, 2019.  ECF No. 1.  The firearm which forms the basis of this Indictment was found on October 11, 2018 during a warrantless search of a vehicle which was in Defendant's care, custody, and control.  The search was conducted in a Walmart parking lot located in Moundsville, WV. Police were called to the parking lot by an anonymous 911 caller who reported seeing a female "shooting up" in the passenger seat of a blue Volkswagen.  Police arrived at the parking lot at approximately 1:45 a.m. on October 11, 2018.  The events which form the basis of this Motion took place during these early morning hours.

As a result of the events which will be described more fully below, Defendant seeks the suppression of the firearm mentioned in the Indictment, as well as any statements made by Defendant after he was detained, and any on-scene, post-search statements made by Defendant regardless of whether *Miranda* warnings were given prior to the same.

During the Evidentiary and Oral Argument hearing on September 11, 2020, the parties presented evidence and witness testimony.  A summary of said evidence is provided below.

### B. Testimony of Zachary Mucheck

Corporal Mucheck is an officer with the Moundsville Police Department.  He has been with the Moundsville Police Department for five (5) years.  He was the first officer on the scene at the Moundsville, Walmart parking lot on the night of this incident, October 11, 2018.  He responded to an anonymous 911 call regarding a female in a blue Volkswagen that was actively "shooting up," i.e. injecting drugs, in the passenger seat of the vehicle.  He claims to have arrived

at the Walmart parking lot between 12:45am and 2:00am.[1]   Corporal Shilling (also with the Moundsville Police Department) arrived moments later.

The parking lot was empty and it was easy to spot the blue Volkswagen identified in the 911 call.  As he approached the blue Volkswagen, he saw a female (later identified as Stacie Garloch) exit the subject vehicle and begin to walk towards the Walmart entrance.  He stopped Ms. Garloch and asked her about the allegations of the 911 complaint, i.e. whether she was shooting up or injecting drugs in the car.  She laughed and denied the claim.  Upon request, she showed her arms to Cpl. Mucheck.  He did not see track marks.  She said that she was doing her makeup in the passenger seat.  Cpl. Shilling began speaking to Ms. Garloch.  At that point, Cpl. Mucheck conducted a visual inspection of the blue Volkswagen using a flashlight.  He did not see anything of note at that time and returned to Cpl. Shilling and Ms. Garloch.

Ms. Garloch was cooperative and was not evasive during the encounter.  Ms. Garloch never exhibited symptoms or signs of drug intoxication during the encounter, including during the latter portion after her arrest and during processing.  Ms. Garloch was clearly made-up (with make-up) during the encounter, and Cpl. Mucheck observed makeup bags in the passenger side door. Officers requested permission to search Ms. Garloch's purse, which Ms. Garloch granted.  No contraband was found in the purse.

Based upon everything officers knew before entering the Walmart to retrieve Ricky Runner, nothing corroborated the allegations of the anonymous caller.

Cpl. Mucheck requested permission from Ms. Garloch to search the vehicle.  She declined because she did not own the vehicle.  At some point thereafter, Cpl. Shilling advised that he found

---

[1] According to the body camera video submitted as evidence, it appears that Officer Mucheck arrived at the parking lot at approximately 1:45 a.m.

what looked to be a glass pipe in the middle console of the type commonly used to smoke narcotics. This pipe was located during a visual search conducted by Cpl. Shilling from outside of the vehicle. They could not tell if the pipe had recently been used. It was taken into evidence but was not field tested. The contents of the pipe have never been tested. Cpl. Mucheck agrees that it is possible the pipe was used or could have been used to smoke hemp but does not believe it is likely.

Cpl. Mucheck entered the Walmart to locate Defendant. Although Cpl. Mucheck's body camera was operational and recording before he entered Walmart, his interaction with Defendant inside of the Walmart is not captured on the video. Nor is it recounted in the report Cpl. Mucheck prepared after this incident. According to Cpl. Mucheck's recollection, he found Defendant by the watch counter and advised that Defendant needed to go outside with Cpl. Mucheck. Defendant complied. Cpl. Mucheck denies telling Defendant that there was an emergency outside involving his girlfriend.

During his interactions with Defendant, Defendant did not appear to be impaired in any way. Defendant did not exhibit symptoms or signs of someone who was intoxicated with drugs or alcohol. Cpl. Mucheck did not detect the odor of alcohol in the air around either Defendant or Ms. Garloch, or around the area of the car.

Once outside of the Walmart, Cpl. Mucheck advised Defendant what was found in the car (the pipe), and that he had been identified as the person driving the car and further as the person in control of the car. At this point, Defendant was not free to leave. Cpl. Mucheck was aware that Defendant's driver's license and Ms. Garloch's driver's licenses had been previously suspended. Officers requested permission to search the vehicle. Defendant declined. Cpl. Mucheck and Cpl. Shilling told Defendant that they did not need his permission, that they had probable cause to

4

search the car.  Cpl. Mucheck sat with Defendant and Ms. Garloch while Cpl. Shilling physically searched the vehicle.

Defendant advised that he was a convicted felon and that he could not be around any firearms.  Both Defendant and Ms. Garloch were arrested for drug possession, and Defendant was arrested for being a felon in possession of a firearm.

The pipe provided the entire basis for officers to enter Defendant's vehicle[2] and conduct a search.  Cpl. Mucheck agrees that the pipe seen in Defendant's vehicle could be used for things other than illegal narcotics, but he believed it to be drug paraphernalia.

**C.  Testimony of Corporal Robert Shilling**

Robert Shilling is a Corporal with the Moundsville Police Department.  He has been there for five and a half (5 ½) years.  Cpl. Shilling is a drug recognition expert with the state of West Virginia.  He responded with Cpl. Mucheck to the Walmart parking lot after receiving a call about a female possibly shooting up.

Once they arrived, Cpl. Mucheck began speaking with Ms. Garloch.  At some point thereafter, he conducted a visual inspection of the blue Volkswagen.  He walked around the passenger side and saw a couple of makeup bags in the passenger side door.  He then walked around the driver's side and from the driver's side window he could see a "stem" – a glass pipe sitting above the shifter on the console.  He concluded they had probable cause to search the vehicle because the stem is drug paraphernalia – it is used to smoke substances like crystal methamphetamine and crack cocaine.

---

[2] The Court acknowledges Defendant's position that the vehicle involved in this case was owned by his cousin. However, for ease of reference, the Court will refer to the vehicle, the blue Volkswagen, as the "Defendant's vehicle."

5

Nothing about the pipe's appearance showed him definitively that the pipe had been used. A visual inspection would likewise not tell him what the pipe had been used for. He is not aware of anyone smoking CBD oil with a glass pipe. He has received training on people smoking CBD oil through a bong, but not a glass pipe.

After Cpl. Mucheck located Defendant in the Walmart and escorted him outside, they searched the vehicle. Cpl. Mucheck and Cpl. Shilling indicated to Defendant that they did not need his permission to search the vehicle. During their search, they located the pipe, 40 caliber ammunition (including a magazine), and a high point 40 caliber firearm in the trunk. Crystal methamphetamine and pills were also located.

### D.  Testimony of Defendant, Ricky Runner

Defendant first encountered Cpl. Mucheck at the watch counter inside of the Walmart. Cpl. Mucheck addressed him as "Ricky" twice before Defendant responded. Defendant did not respond initially because no one calls him "Ricky" – they call him "Stick." When he turned to look at Cpl. Mucheck, he noticed that Cpl. Mucheck was wearing a police uniform. Cpl. Mucheck advised Defendant that Defendant needed to go outside with him because there was an emergency involving his girlfriend. Defendant asked what the emergency was. Cpl. Mucheck did not elaborate – he simply advised that Defendant needed to go outside, that it was an emergency. Once outside, Defendant saw Ms. Garloch standing with multiple cop cars around her, lights flashing.

### E.  Testimony of William Schmitt

William Schmitt lives in Bellaire, Ohio. He is the proprietor of a business referred to as the Holistic Cloud, which is a CBD shop that sells cannabidiol products, pipes, and things of that nature. His store also sells hemp, which is marijuana that contains a noncriminal amount of THC. He sells oils and smoking devices, including glass pipes. He has sold approximately 1,000 pipes

6

this year.  People use those pipes to smoke both hemp and oil.  His store services approximately 30 to 40 people per day.

Mr. Schmitt has been involved in CBD for approximately seven (7) years.  He considers himself an activist in this area.  He has advocated for CBD as a therapeutic means of addressing a myriad of ailments, including headaches or muscle aches, and bipolar disorder, among others.  The sale of CBD has become popular in the last ten (10) years.

In his firsthand knowledge, individuals smoke CBD oil in pipes.  That is something which is done with frequency in the CBD world.  The most traditional way for people to ingest CBD oil is oral drops.

He is not aware of any studies which show the frequency with which people smoke CBD oil using a pipe.  He is also not aware of research that shows pipes are used more often to smoke illicit substances such as methamphetamine or crack cocaine.  He is similarly not aware of how many of his customers are buying pipes to smoke illegal substances.

Mr. Schmitt is not aware of criminal case reports which find that items like a pipe which can be used for something legal can still provide probable cause for a search.

### F.  Body Camera Video from Cpl. Mucheck

At approximately 1:48:06 a.m. on October 11, 2018, Cpl. Mucheck approaches a female who has just exited what appears to be a dark blue Volkswagen and asks whether she is shooting up.  He advises that they received a 911 call regarding someone shooting up in the Walmart parking lot in Moundsville.  She denies the claim and states that she was doing her makeup.  Cpl. Mucheck asks her to show her arms.  She complies.  She pulls up the sleeves on her sweatshirt to display the insides of her arms.

Cpl. Shilling asks for consent to search her purse. Ms. Garloch grants consent. Ms. Garloch continues to deny shooting up. She explains that she was putting on makeup. She does not have ID on her but identifies herself as Stacie Garloch.

Ms. Garloch continues to deny the 911 caller's allegation. She displays the pockets of her jeans to show that nothing is in her pockets.

At approximately 1:51:37 a.m., Cpl. Mucheck begins a visual inspection of the interior of the Volkswagen. He conducts the visual inspection by shining a light on the interior of the vehicle. He searches both the passenger side and the driver's side. He finds nothing and returns to Cpl. Shilling and Ms. Garloch at approximately 1:52:53 a.m.

No contraband was found in Ms. Garloch's purse. Cpl. Shilling and Ms. Garloch discuss whether Ms. Garloch was shooting up and the 911 call. Ms. Garloch admits that she used to 'do that,' but states that she does not 'do that' anymore. Scars from old track marks are visible on her arms. She discusses the old track marks with Cpl. Shilling.

Cpl. Shilling and Cpl. Mucheck next discuss going into the Walmart to locate Defendant to see if they could get consent to search the car. At approximately 1:56:32, Cpl. Shilling begins his visual inspection of the interior of the vehicle. He sees a container with powder in it on the floor of the front passenger side. Cpl. Shilling questions Ms. Garloch regarding the contents of her makeup bag in the passenger side of the door. She advises that it is makeup. At approximately 1:58:35 a.m., Cpl. Shilling points out to Cpl. Mucheck that a pipe is in the center of the console. Cpl. Shilling believes it to be either a "crack pipe" or a "meth pipe." Ms. Garloch disclaims knowledge of the pipe. Cpl. Mucheck requests a description of Defendant. Ms. Garloch provides one. At approximately 1:59:17, Cpl. Mucheck walks toward Walmart to locate Defendant. At

8

approximately 1:59:50 a.m., the body camera video stops when Cpl. Mucheck is just inside the Walmart near the Subway (the logo is pictured in the top left of the screen).

At approximately 2:02:14 a.m., the video resumes. Defendant is pictured walking outside with Cpl. Mucheck. Cpl. Shilling asks Defendant if he has an ID. Defendant confirms he has an ID but no driver's license. Defendant advises that the vehicle is not his. Defendant advises that when he left Ms. Garloch, she was doing her makeup.

Defendant declines to give permission to search the car. Ms. Garloch previously declined permission to search the car (according to officers). Cpl. Shilling advises that they do not need permission to search the vehicle because they have probable cause to search the vehicle as a result of the pipe located in the center console. The search commences at approximately 2:04:51 a.m.

Cpl. Mucheck contacts the station with Defendant's name and date of birth and eventually his social security number. His license comes back as suspended.

Marijuana is located in the car. (Defendant admits that it is likely in the car and seems to assist the officers in locating it.) At approximately 2:14:45 a.m., Cpl. Mucheck pats down Defendant. He asks Defendant if a gun is in the car. Defendant does not know but indicates that it is possible because his cousin owns firearms. On Defendant's person, Cpl. Mucheck finds items that belong to the store. Defendant advises that he put the items (jewelry) in his pocket because he did not have a buggy. Defendant is formally detained and handcuffed at approximately 2:17:30 a.m. Cpl. Mucheck advises that in the state of West Virginia, if you put an item in your pocket, you are shoplifting.

At approximately 2:20:18 a.m., Cpl. Shilling locates Xanax in a makeup bag. At approximately 2:21:51 a.m., Cpl. Shilling locates crystal methamphetamine in a makeup bag. At

approximately 2:25:00 a.m., Defendant offers to work with the Drug Task Force if Cpl. Mucheck will let them leave without proceeding further.

At approximately 2:27:10 a.m., Defendant advises Cpl. Mucheck that his cousin collects firearms and they may be in the car.  The car involved is Defendant's cousin's car.

At approximately 2:31:46 a.m., Cpl. Shilling advises Cpl. Mucheck that crystal methamphetamine was located in the black bag in the trunk where the firearms were located.  At approximately 2:33:00 a.m., Cpl. Shilling locates a needle in the trunk.  At approximately 2:37:47 a.m. officers request a firearm check from the station for a high point firearm.  No identifying information came back for the gun.  At approximately 2:44:55 a.m., Cpl. Shilling and Cpl. Mucheck discuss the ammunition found in the vehicle.[3][4]

## II.
## ARGUMENTS OF THE PARTIES

### A. Defendant's Arguments

Defendant argues that the presence in Defendant's vehicle of a glass pipe such as the one at issue in this case, without more, does not establish probable cause to search because possession of drug paraphernalia is not a criminal offense in West Virginia, according to W. Va. Code § 60A-4-403a [1980].  Even if such an item did historically provide probable cause to conduct a search, it no longer can do so given the recent development of the CBD market, and the sale of items

---

[3] The body camera video is from the camera that Cpl. Mucheck was wearing on the night of this arrest.  Because Cpl. Mucheck walks back and forth between Cpl. Shilling, who is searching the blue Volkswagen, and Defendant, who is some distance away from the Volkswagen and near one of the police cruisers, it is difficult to hear Cpl. Shilling's entire account of the items found.  During the hearing, Cpl. Shilling testified he found ammunition and a high point 40 caliber firearm in the trunk of the Volkswagen.  Crystal methamphetamine and pills (Xanax) were also found in the car.

[4] The entire body camera video is not summarized here.  The video extends beyond the arrest of Ms. Garloch and Defendant and includes processing at the police station.  Because the only issue before the Court is whether officers had probable cause to search the vehicle, the summary includes the events leading up to the search and the search only.

ancillary to CBD, such as the glass pipe at issue.  The pipe on which Moundsville police officers relied to gain entry to Defendant's vehicle, therefore, was not in "plain view" within the meaning of the term as provided in *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997) because it was not "immediately apparent" that the pipe constituted contraband.

Defendant argues that any and all statements made by Defendant after he was detained should be suppressed because they were custodial statements made in derogation of his Fifth Amendment rights.  Finally, Defendant argues that any statements he made after the search should be suppressed because the search was unconstitutional.

## B. Government's Arguments

The Government contends that officers had probable cause to search the Defendant's vehicle on the day in question because of the presence of the pipe, which was in plain view in Defendant's vehicle, and the nature of the same was immediately apparent to officers.  Simply because such an item may be used for a legal purpose, i.e. to smoke hemp or CBD oil, does not mean that this item cannot support probable cause.  Accordingly, the Government argues that Defendant's Motion should be denied.

## III.
## STANDARDS

The burden of proof for a Motion to Suppress is on the party seeking to suppress the evidence. *United States v. Gualtero*, 62 F.Supp.3d 479, 482 (E.D. Va. 2014) ("[t]he legal standards governing a motion to suppress are clear….[t]he burden of proof is on the party who seeks to suppress the evidence") (citing *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981)).  Once the defendant establishes a basis for his Motion, the burden shifts to the Government to prove by a preponderance of the evidence that the challenged evidence is admissible. *Id.* (citing *United States v. Matlock*, 415 U.S.

164, 177 n. 14 (1974) ("the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence").

With these standards in mind, the undersigned will turn to the substance of the arguments raised vis-à-vis Defendant's Motion to Suppress and Supplemental Motion to Suppress.

# IV.
# DISCUSSION

As the parties have made clear, the central issue in this case is whether the nature of the pipe at issue was immediately apparent and justified the subsequent search of the vehicle, which search uncovered the firearm that forms the basis of instant Indictment (among other things). For the reasons set forth below, the undersigned would conclude that the nature of the pipe at issue was immediately apparent and therefore justified the subsequent search of Defendant's vehicle.

## A. Plain View, "Immediately Apparent," and Seizure of the Pipe

"The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *U.S. v. Jackson*, 131 F.3d 1105, 1108 (4th Cir. 1997) (citing U.S. Const. Amend. IV). "The constitutional protection against an unreasonable search is distinct from the protection against an unreasonable seizure. A search compromises the individual interest in privacy; a seizure compromises the individual of dominion over his or her person or property." *Jackson*, 131 at 1108 (citing *Horton v. California*, 496 U.S. 128, 133, 110 S.Ct. 2301, 2305 (1990).

"The 'plain-view' doctrine provides an exception to the warrant requirement for the seizure of property, but it does not provide an exception for a search." *Jackson*, 131 F.3d at 1108. When an article is viewed in plain view, the viewing does not involve an invasion of privacy and, as a result, does not constitute a search implicating the Fourth Amendment. *Id.*

12

"It is...an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301, 2308 (1990). Additionally, the item must be in plain view, and its incriminating character must be immediately apparent. *Id.* In other words, "the plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997). No arguments have been made concerning the first two prongs of the plain-view doctrine, so the undersigned will not address the same here. The parties, instead, have focused on the third prong, which mandates that the object's incriminating character be immediately apparent to law enforcement. The undersigned will turn to those arguments.

Defendant argues that the incriminating character of the pipe at issue could not have been immediately apparent to officers because pipes such as the one at issue can be used to smoke legal materials, such as CBD oil and hemp. Defendant presented evidence in the form of Mr. Schmitt's testimony to support this argument. Defendant also cross-examined Cpl. Mucheck and Cpl. Shilling regarding whether the officers tested the pipe to determine if it had been used and, if so, what substance had been consumed in it. The thrust of this evidence and the arguments it supports seems to be that officers were not possessed of the requisite amount of certainty that the pipe in question was used to smoke illegal substances when they seized it and when they began their search of Defendant's vehicle. As a result, the "immediately apparent" prong of the "plain view" standard is not met in this case. The undersigned is not persuaded by this argument.

As the Supreme Court explained in *Texas v. Brown*, the phrase "immediately apparent" was "very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." *Texas v. Brown*, 460 U.S. 730, 741, 103 S.Ct. 1535, 1543 (1983), *abrogated on other grounds by Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301 (1990)).  To the contrary, the "immediately apparent" language was not meant to and did not establish any requirement that a police officer "know" that certain items are contraband or evidence of a crime. *Brown*, 460 U.S. at 741.  Rather, the appropriate standard is as follows: "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming there is probable cause to associate the property with criminal activity." *Id.* at 738, 741-42 (quoting *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371 (1980) (internal citations and quotations omitted)).

> [P]robable cause is a flexible, common-sense standard.  It merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.  A practical, nontechnical probability that incriminating evidence is involved is all that is required.

*Brown*, 460 U.S. at 742 (internal citations and quotations omitted).  For the reasons that follow, the undersigned believes that probable cause existed for officers to believe that the pipe in question constituted contraband or evidence of a crime.

On the night in question, officers received a 911 call about a woman "shooting up" in the passenger side of a blue Volkswagen in the Walmart parking lot in Moundsville, WV.  When officers arrived at the Walmart, they easily located the vehicle implicated by the 911 call and witnessed a female exit the passenger side of said vehicle.  Officers arrived at the Walmart at approximately 1:45 a.m.

Officers approached the female, later identified as Ms. Garloch, and questioned her regarding the 911 caller's assertions. Ms. Garloch denied shooting up and stated that she had been doing her makeup. Defendant's position regarding Ms. Garloch's demeanor (i.e. no visible evidence of intoxication) is well-taken. However, for obvious reasons, whether someone is "shooting up" is not something a person readily admits when questioned by an officer.

Defendant contends that no track marks were visible on Ms. Garloch's arms, but this assertion is not entirely accurate. Ms. Garloch, by her own admission, had at least 'old' track marks on her arms, indicating a history of intravenous drug use. The fact of these track marks lends further credence to the 911 caller's claims that they saw someone shooting up in the Moundsville Walmart parking lot. Ms. Garloch's characterization of the track marks as 'old' does nothing to diminish the import of the marks themselves: according to the body camera video, the marks themselves were not closely analyzed by officers, and they were labeled 'old' by Ms. Garloch. That is, the label of "old" track marks was not necessarily the conclusion of police officers. Indeed, on the body camera video, Cpl. Shilling appears unconvinced by Ms. Garloch's assertions that they are old track marks.

The timing of this interaction is also suspicious. Though it is certainly not illegal to be at a Walmart at 1:45 a.m., putting on makeup, it is not a likely scenario, either. There is no evidence that Ms. Garloch and Defendant were at the Walmart to solve an emergency, i.e. diapers, formula, or something that needed to be purchased but that could not wait until later in the morning.[5] Such evidence would have helped to dispel the very reasonable notion that Ms. Garloch was not being completely truthful with officers.

---

[5] Indeed, it appears that no such emergency existed. After Defendant had been detained, he was found to have batteries and several pieces of jewelry in his pockets. He denied attempting to shoplift.

15

Against this backdrop of facts, Cpl. Mucheck and Cpl. Shilling each conducted their own visual inspection of Defendant's vehicle. During his inspection, Cpl. Shilling saw what he called a stem pipe in the center console of the car. Cpl. Shilling testified that, based upon his training and experience as a drug recognition expert with the State of West Virginia, he believed the pipe to be a device typically used to smoke methamphetamine and/or crack cocaine. During the September 11, 2020 hearing, Cpl. Shilling described his training in narcotics, which training included devices such as the pipe at issue. Cpl. Shilling's immediate impression of the nature of the pipe is also captured on the body camera video - Cpl. Shilling points out the pipe to Cpl. Mucheck and tells him that the pipe is a 'meth pipe or a crack pipe.' Based upon the above-detailed factual backdrop, and given Cpl. Shilling's training and experience, the undersigned would conclude that it was reasonable for Cpl. Shilling to believe that the pipe in the console of Defendant's vehicle was used to smoke illegal substances, and therefore, the criminal nature of the pipe was immediately apparent.

Defendant argues that with the recent advent of CBD oil and hemp, the pipe at issue could have just as easily been used to smoke either one of those two legal substances. Defendant's argument is well-taken. However, simply because pipes of this nature can and apparently have been used more recently to smoke legal substances does not neutralize Cpl. Shilling's conclusion that the pipe was contraband or constituted evidence of a crime. *See Brown, supra*. Again, his conclusion was based upon his experience and training, and upon the facts in his purview at the time of the seizure, none of which included any indication that the pipe in question had been used to smoke CBD oil or hemp. This argument is therefore not persuasive.

Because there was probable cause to believe the pipe constituted contraband or evidence of a crime, probable cause existed to search the balance of Defendant's vehicle on the night in question.

## B.  Probable Cause to Search

"The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *United States v. Davis*, 576 Fed.Appx. 292, 294 (4th Cir. 2014) (quoting *California v. Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982 (1991). As was explained above, probable cause is a flexible, common-sense standard. "[I]t does not demand any showing that such a belief be correct or more likely true than false. A practical, nontechnical probability that incriminating evidence is involved is all that is required." *Texas v. Brown*, 450 U.S. 730, 742, 103 S.Ct. 1535, 1544 (1983) (internal citations and quotations omitted).

Defendant argues that probable cause to search Defendant's vehicle did not exist on the night in question because the mere presence of a glass pipe, without more, no longer vests police with probable cause to search in light of the rise of use of legal substances such as CBD oil and hemp, which are smoked using a device such as the one found in Defendant's vehicle. To support his position, Defendant relies upon a line of cases addressing the smell of burning or burnt marijuana and the implications of the same for purposes of probable cause. However, a review of the cited case law reveals that these cases are not instructive in the case at bar. By all indications, the cases upon which Defendant relies imply that it is easy to confuse the smell of burnt marijuana with legal hemp, and without knowing what a person is smoking, it is difficult to place the weight of probable cause on this one fact. While this may be true, such a sentiment is of no moment here because the smell of marijuana and/or hemp is not implicated by the evidence in this case.

Moreover, the absence of the smell of burning marijuana or hemp works against Defendant's case in this instance.  If the smell had been present, that would have more closely confined the pipe at issue to being used for hemp or marijuana.  In such an instance, any argument that probable cause to search for methamphetamine and/or crack existed would have been less convincing because it would not have been as likely that the pipe was used to smoke methamphetamine and/or crack.  However, because no marijuana or hemp smell was present, this expands the possibilities for the drugs for which the pipe could have been used.  In other words, it becomes just as likely that the pipe was or could have been used to smoke methamphetamine or crack as it is that the pipe was or could have been used to smoke hemp or marijuana.  Because of this and because there is evidence that a pipe such as the one at issue is commonly used to smoke methamphetamine and/or crack cocaine, the presence of the pipe is reasonably indicative of the presence of illegal substances in the vehicle.  Further, and again, officers were not required to establish with any particularity the chances or the likelihood that the pipe was used to smoke methamphetamine and/or crack, as opposed to being used to smoke marijuana, CBD oil and/or hemp, before relying upon the same as a basis for probable cause.  *See Brown, supra*.

Defendant also contends that other jurisdictions have held that the presence of a pipe, without more, does not supply probable cause to arrest.  Defendant cites *T.T. v. State*, 253 So.3d 15 (Fla. App. 2018) and *Walker v. State, supra* in support of this argument.  A review of those cases reveals, however, that they are not useful for our purposes.

In *T.T. v. State*, the court recognized that "Florida courts have declined to find probable cause when an object, commonly used for drugs, is seen or touched."  *T.T.*, 253 So.3d at 16 (citing *Walker v. State*, 514 So.2d 1149 (Fla.2d DCA 1987) (plain view of

18

pipe did not constitute probable cause to arrest for possession of paraphernalia)). The court did so while considering whether a motion to suppress was rightly decided by the trial court.

In *T.T. v. State*, appellant was charged by petition for delinquency with possession of cannabis. *T.T.*, 253 So.3d 15 (Fla. 4th DCA 2018). Cannabis was found on appellant's person when an officer patted appellant down for weapons. The pat-down occurred after appellant was asked to step out of a car in which he was a rear-seat passenger at the time of a traffic stop. *Id.* at 17. Appellant filed a motion to suppress, which was denied by the trial court. He pled no contest to the charges and reserved his right to appeal the suppression ruling. *Id.*

The appellate court found that the trial court erred when it denied appellant's motion to suppress. In so holding, the court noted that there was no testimony that the officer smelled marijuana prior to the pat-down. Further, the officer admitted that at the time of the pat-down search, he knew the item later identified as marijuana was not a weapon. The court ultimately determined that the officer's testimony regarding his training and experience was not sufficient for the trial court to find that his conclusion that appellant had contraband on his person was something more than a "feeling" or a "hunch." *Id.* at 19-20.

In *Walker*, two St. Petersburg police detectives were working in the south St. Petersburg area on October 17, 2016 near several cottages where it was claimed numerous drug arrests had been recently made. They walked between cottages trying to catch someone in the process of dealing drugs. This area in particular was referred to as a "high crime" area by police – this despite the fact that no recent criminal activity had been reported there. *Walker*, 514 So.2d at 1150.

One of the aforementioned officers approached Mr. Walker who was sitting on the front porch of his residence. According to officers, Mr. Walker made a quick move as if to conceal something behind his right hip. Officers ordered him to produce what he had in his hand. He did

not immediately comply.   The officer pulled his gun and again ordered him to do so.   When Mr. Walker did not reveal the object, the officer frisked him and, feeling a hard object in Mr. Walker's back pocket, pulled out a smoking pipe.   Officers arrested Mr. Walker for possession of drug paraphernalia.   *Id.*

Mr. Walker moved to suppress the evidence of the pipe.   When testifying during the suppression hearing, the officer admitted that he knew the object in Mr. Walker's back pocket was a pipe and not a gun before he seized it.   Notwithstanding this testimony, the trial court denied Mr. Walker's motion.   On appeal, the Florida Appellate Court reversed because the initial stop and the subsequent search violated the Stop and Frisk Law contained in the Florida statutes.   *Id.*   In explaining the decision, the court held that the officer did not have "founded suspicion" to temporarily detain Mr. Walker on the night of the interaction in question.   Rather, he had only what the court called "mere suspicion," which was not based on anything other than a hunch.   *Id.* at 50-51.   The court further explained that, even if reasonable suspicion to detain existed, the officer exceeded the permissible scope of an investigatory pat-down when he reached into Mr. Walker's pocket to retrieve an item he admittedly knew was not a weapon.   *Id.* at 51.   Finally, the court held that, although the stem of the pipe seized was in plain view, the pipe alone nevertheless could not constitute probable cause to arrest for possession of paraphernalia because pipes are used to smoke materials other than drugs.   Consequently, they are not contraband *per se*.   Importantly, officers did not notice anything else that would lead them to believe that the pipe in question had been used for illegal purposes.   *Id.* at 1151.   That is not the case here.

In the instant matter, before officers even arrived on scene, they received a call stating that a female in a blue Volkswagen was shooting up in the passenger seat of the car, which was located in the Moundsville Walmart parking lot.   When officers arrived at the Walmart a short time later,

officers easily identified the blue Volkswagen because of the dearth of vehicles in the parking lot, and they saw a lone female exit the passenger side of the blue Volkswagen.  They approached her and questioned her about the allegations in the 911 call, which she denied.  This denial is acknowledged; however, as was mentioned previously, the denial does not carry much weight because persons who inject illegal drugs are not likely to admit to such activity, especially to a police officer.  In addition to finding the vehicle which matched the description of the anonymous caller, and in addition to encountering a female in and around the passenger side of the vehicle, this call and this interaction occurred at approximately 1:45 a.m. – an unusual hour to be in a Walmart parking lot applying one's make up.  Ms. Garloch also displayed track marks on her arms.  Though she contended that the track marks were 'old,' the track marks nevertheless constituted evidence of illegal drug use, especially when combined with her admission that she 'used to' inject narcotics.  They were also consistent with the allegations made by the person in the anonymous 911 call.  When officers found the pipe against this backdrop of facts, a reasonable belief clearly existed that illegal substances would be found in the balance of the vehicle.  This is wholly different than *T.T.*, where the only arguable evidence of illegal activity was the appellant's bloodshot eyes and uncomfortable demeanor.  This is also wholly different than *Walker* where the only arguable evidence of illegal activity was a pipe (which was not detected until after an invalid stop and frisk) and nothing else.

Moreover, the *Walker* holding is not on all fours with this case.  The *Walker* court noted that probable cause to <u>arrest</u> would not exist if officers relied upon a pipe and nothing more to arrest Mr. Walker.  However, the issue before this Court is <u>not</u> whether there was probable cause

to arrest Defendant[6]; but rather, whether probable cause to search Defendant's vehicle existed. These are two distinctly different inquiries. Probable cause to arrest a suspect requires probable cause to believe that the suspect committed a crime. Probable cause to search requires probable cause to believe that the specific object of the search will be found in a particular place. *United States v. Griffith*, 867 F.3d 1265, 1271, 432 U.S.App.D.C. 234, 240 (D.C. 2017) (citing *Steagald v. United States*, 451 U.S. 204, 212-13, 101 S.Ct. 1642 (1981). The validity of Defendant's arrest did not rely upon the pipe alone, as the court theorized in *Walker*. Rather, the question here is whether officers were justified in searching the balance of Defendant's vehicle after finding the pipe, and in light of the totality of the circumstances that existed at the time of the search. The *Walker* case is therefore not persuasive.

## V.
## CONCLUSION

Defendant has failed to establish a basis upon which to suppress the evidence that is the subject of his Motions. Further, the Government has met its burden by a preponderance of the evidence. Accordingly, and for all of the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's **Motion to Suppress [21] and Supplemental Motion to Suppress [32] be DENIED**.

Any party who appears *pro se* and any counsel of record, as applicable, may, within **fourteen (14) days** after being served with a copy of this Report and Recommendation file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to

---

[6] One could credibly argue that because the arrest came after the search, the issue of whether probable cause to arrest is in fact before the Court. However, this argument is derivative of the main issue, which is whether officers had probable cause to search Defendant's vehicle in the first instance.

the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to parties who appear pro se and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia, to the United States Marshals Service and to the United States Probation Office.

Dated: 9-28-2020

JAMES P. MAZZONE
UNITED STATES MAGISTRATE JUDGE

23